277 F.3d 1361 (Fed. Cir. 2002)
 SYMBOL TECHNOLOGIES, INC., ACCU-SORT SYSTEMS, INC., INTERMEC TECHNOLOGIES CORPORATION, METROLOGIC INSTRUMENTS, INC., PSC INC., TEKLOGIX CORPORATION,
ZEBRA TECHNOLOGIES CORPORATION, and COGNEX CORPORATION, Plaintiffs-Appellants,
v.
LEMELSON MEDICAL, EDUCATION & RESEARCH FOUNDATION, LIMITED PARTNERSHIP,
Defendant-Appellee.
 No. 00-1583
 United States Court of Appeals for the Federal Circuit
 January 24, 2002
 
 Appealed from: United States District Court for the District of Nevada, Judge Philip M. ProJesse J. Jenner, Fish & Neave, of New York, New York, argued for plaintiffs-appellants. Of counsel on the brief were Albert E. Fey and Charles Quinn.
 Gerald D. Hosier, Law Offices of Gerald D. Hosier, Ltd., of Las Vegas, Nevada, argued for defendant-appellee. On the brief were Louis J. Hoffman, Louis J. Hoffman, P.C., of Scottsdale, Arizona. Of counsel on the brief were Scott L. Nelson, of Washington, DC; and Bruce S. Sperling, Sperling & Slater, of Chicago, Illinois.
 George M. Sirilla, Pillsbury Madison & Sutro LLP, of Washington, DC, for amicus curiae National Retail Federation. With him on the brief was David W. Long.
 Alan H. Blankenheimer, Brown & Bain, P.A., of Phoenix, Arizona for amici curiae the Semiconductor Industry Association and the National Association of Manufacturers. Of counsel on the brief was Jodi Knobel Feuerhelm. Of counsel were Jan S. Amundson, General Counsel; and Quentin Riegel, Deputy General Counsel, National Association of Manufacturers, of Washington, DC.
 Cheryl L. Johnson, Squire, Sanders & Dempsey L.L.P., of Los Angeles, California for amici curiae Uniform Code Council, et al. Of counsel on the brief was Mark C. Dosker, Squire, Sanders & Dempsey L.L.P., of San Francisco, California.
 George L. Graff, Paul, Hastings, Janofsky & Walker LLP, of New York, New York, for amicus curiae Intellectual Property Owners Association.
 Ronald Abramson, Hughes Hubbard & Reed LLP, of New York, New York, for amicus curiae The Association of the Bar of the City of New York. With him on the brief was Charles E. Miller, Pennie & Edmonds LLP, of New York, New York.
 Edward T. Colbert, Kenyon & Kenyon, of Washington, DC, for amicus curiae The Chamber of Commerce of the United States. With him on the brief were Kenneth R. Corsello, and Fred T. Grasso. Of counsel was Stephen A. Bokat, National Chamber Litigation Center, Inc., of Washington, DC.
 Before MAYER, Chief Judge, NEWMAN and CLEVENGER, Circuit Judges.
 MAYER, Chief Judge.
 
 
 1
 Symbol Technologies, Inc., Accu-sort Systems, Inc., Intermec Technologies Corporation, Metrologic Instruments, Inc., PSC Inc., Teklogix Corporation, Zebra Technologies Corporation, (collectively "Symbol"), and Cognex Corporation ("Cognex") appeal the judgment of the United States District Court for the District of Nevada dismissing various counts of their complaints for failure to state a claim. Symbol Tech., Inc., et al., v. Lemelson Med., Educ. & Research Found., Ltd. P'ship, 99-CV-0397 (D. Nev. Mar. 21, 2000). Because the district court incorrectly concluded that the defense of prosecution laches was unavailable as a matter of law, we reverse the judgment and remand the case.
 
 Background
 
 2
 Lemelson Medical, Education & Research Foundation, Limited Partnership ("Lemelson") claims to be the assignee of some 185 unexpired patents and many pending patent applications of Jerome H. Lemelson. The patents at issue generally involve machine vision and automatic identification technology and allegedly are entitled to the benefit of the filing date of two applications filed in 1954 and 1956.
 
 
 3
 Symbol and Cognex (collectively "plaintiffs") design, manufacture, and sell bar code scanners and related products. In 1998, their customers began to receive letters from Lemelson stating that the use of the plaintiffs' products infringed various Lemelson patents. Plaintiffs claim that they will be forced to indemnify these customers should any of the patents be found to be infringed.
 
 
 4
 Symbol brought a declaratory judgment action pursuant to 28 U.S.C. 2201(a) (1994), against Lemelson, the owner of U.S. Patents 4,338,626; 4,969,038; 4,979,029; 4,984,073; 5,067,012; 5,119,190; 5,119,205; 5,128,753; 5,144,421; and 5,351,078, seeking a judgment that the patents are invalid, unenforceable, and not infringed by Symbol or its customers. Symbol Tech., Inc., et al., v. Lemelson Med., Educ. & Research Found., Ltd. P'ship, 99-CV-0397. Cognex brought a similar action (CV-N-99-0533-PMP) adding U.S. Patents 4,118,730; 4,148,061; 4,511,918; 5,023,714; 5,249,045; and 5,283,641. Cognex Corp. v. Lemelson Med., Educ. & Research Found., Ltd. P'ship, 99-CV-0533. The gravamen of the complaints most pertinent to us is prosecution laches. The trial court consolidated the cases.
 
 
 5
 Lemelson moved for dismissal arguing that there was no case or controversy and that the plaintiffs' cause of action for prosecution laches failed to state a claim upon which relief could be granted. The district court concluded that there was a sufficient case or controversy but dismissed plaintiffs' laches claims. The sole issue on appeal is whether, as a matter of law, the equitable doctrine of laches may be applied to bar enforcement of patent claims that issued after an unreasonable and unexplained delay in prosecution even though the applicant complied with pertinent statutes and rules.
 
 Discussion
 
 6
 In reviewing the propriety of decisions under Fed. R. Civ. P. 12(b)(6), we apply the rule of the regional circuit - in this case the United States Court of Appeals for the Ninth Circuit. Phonometrics v. Hospitality Franchise Sys., Inc., 203 F.3d 790, 793, 53 USPQ2d 1762, 1764 (Fed. Cir. 2000). Therefore, consistent with the rule in the Ninth Circuit, we review the decision below de novo, and "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." O'Loghlin v. County of Orange, 229 F.3d 871, 874 (9th Cir. 2000); accord Advanced Cardiovascular Sys., v. Scimed Life Sys., Inc., 988 F.2d 1157, 1160, 26 USPQ2d 1038, 1041 (Fed. Cir. 1993). We have jurisdiction pursuant to 28 U.S.C. 1292(b) & (c).
 
 
 7
 The defense of prosecution laches finds its origin in two Supreme Court cases: Woodbridge v. United States, 263 U.S. 50 (1923); and Webster Electric Co. v. Splitdorf Electrical Co., 264 U.S. 463 (1924). The Court first applied the doctrine in Woodbridge to render a patent unenforceable where there had been an unexplained nine-year delay. Pursuant to a statute in place at the time, the Patent Office agreed to delay the issuance of Woodbridge's patent for one year. At the end of that time, the Patent Office neglected to issue the patent. Rather than inform the Patent Office of its error, Woodbridge waited nine years before requesting that the patent be issued. At the time of issuance, he sought to amend his specification and claims to encompass related innovations that had occurred in the intervening nine years. Woodbridge justified these actions on the ground that his invention had only recently become "pecuniarily" valuable. 263 U.S. at 51-53. The Court held that because of his delay, he had forfeited his rights to the patent. "In this case we have a delay of nine years and a half in securing a patent that might have been had at any time in that period for the asking, and this for the admitted purpose of making the term of the monopoly square with the period when the commercial profit from it would have been highest. . . . Meantime other inventors had been at work in the same field . . . without knowledge of the situation with respect to Woodbridge's invention. . . . This is not a case of abandonment. It is a case of forfeiting the right to a patent by designed delay." Id. at 56.
 
 
 8
 The Court applied the doctrine in Webster a year later and held that an unreasonable eight-year delay rendered the claims at issue unenforceable. In that case, Kane filed a patent application in 1910 that ultimately issued in 1916. In 1915, while the original application was still pending, Kane filed a divisional application copying nine claims of a recently issued patent for the purpose of provoking an interference. After losing the interference, he filed two additional claims, claims 7 and 8, which issued in 1918 and were the subject of the litigation. These claims had not been involved in the earlier interference. "During all of this time the subject-matter [of the claims] was disclosed and in general use; and Kane and his assignee, so far as claims 7 and 8 are concerned, simply stood by and awaited developments." 264 U.S. at 465. In holding claims 7 and 8 unenforceable, the Court stated, "[w]e have no hesitation in saying that the delay was unreasonable, and, under the circumstances shown by the record, constitutes laches, by which the petitioner lost whatever rights it might otherwise have been entitled to." Id. at 466. The Court went on to say that a two-year delay was prima facie evidence of unreasonableness. Id. at 471.
 
 
 9
 The Supreme Court subsequently ratified prosecution laches as a defense to an infringement action involving new claims issuing from divisional and continuing applications that prejudice intervening adverse public rights. See Crown Cork & Seal Co. v. Ferdinand Gutmann Co., 304 U.S. 159, 37 USPQ 351 (1938); Gen. Talking Pictures Corp. v. W. Elec. Co., 304 U.S. 175, 37 USPQ 357 (1938). In Crown Cork, the Court held that the presumptive two-year time limit of Webster was dictum because it was "not directly applicable to the precise question of laches upon which the case turned." 304 U.S. at 167, 37 USPQ at 354. The Court continued: "It is clear that, in the absence of intervening rights, the decision in Webster Co. v. Splitdorf Co. does not mean that an excuse must be shown for a lapse of more than two years in presenting [a] divisional application." Crown Cork at 167-68, 37 USPQ at 354. By this, the court ratified the existence of the prosecution laches defense; it did not apply the defense there in the absence of intervening rights. Similarly, in General Talking Pictures, the Court rejected the defense of prosecution laches because there was no evidence of intervening public rights. "In the absence of intervening adverse rights for more than two years prior to the continuation applications, they were [filed] in time." 304 U.S. at 183, 37 USPQ at 360. This case likewise evinced the existence of prosecution laches. Indeed, the contemporary learned treatises confirmed the existence of the prosecution laches defense. See 2 Anthony William Deller, Walker on Patents 183-184 (1937 and 1948 Supp.); Beirne Stedman, Patents 111 (Michie Co. 1939).
 
 
 10
 Lemelson argues that the defense is not available here for three reasons: 1) the rule espoused in Webster and its progeny is limited to claims arising out of interference actions; 2) the plain language and legislative history of the Patent Act of 1952 forecloses the application of prosecution laches; and 3) two of our non-precedential opinions reject the prosecution laches defense and should be binding upon us under the reasoning of Anastasoff v. United States, 223 F.3d 898 (8th Cir. 2000), vacated as moot, 235 F.3d 1054 (8th Cir. 2000) (en banc). We address each argument in turn.
 
 
 11
 1. Quoting 4 Donald S. Chisum, Patents 11.05[1] at 11-264 (1996), Lemelson argues that prosecution laches has been limited to claims arising out of interference proceedings: "Possible implications of Webster Electric outside the interference context were dispelled by the Supreme Court in Crown Cork & Seal Co. v. Ferdinand Gutmann Co." We find no support for this view. As discussed above, the claims at issue in Webster were not the subject of an interference proceeding. The Court was more concerned with the reasonableness of the delay between the initial filing of the application and the subsequent filing of claims 7 and 8 than it was with the interference. Nothing suggests that Webster was limited to cases involving an interference. Crown Cork validated prosecution laches and did not limit it to cases involving interferences. Rather it took aim at the bright-line rule established by Webster that a two-year delay is prima facie unreasonable and eliminated it.
 
 
 12
 2. Lemelson argues that the passage of the 1952 Patent Act, specifically 35 U.S.C. 120 and 121, entitling continuation and divisional applications respectively to the filing dates of their parents, foreclosed the application of laches. Section 120 provides that if "[a]n application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States . . . by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application . . ." 35 U.S.C. 120 (1994). Section 121 provides that "a divisional application which complies with the requirements of section 120 of this title [ ] shall be entitled to the benefit of the filing date of the original application." Id. 121. These sections provide the backbone for the modern continuation and division practice.
 
 
 13
 Lemelson asserts that by passing these two sections, especially allowing the continuation practice, Congress abrogated the defense of prosecution laches. But the legislative history and commentary from the authors of the 1952 Act suggest no such intent. Prior to 1952, continuation practice was governed by common law rather than statute. "Section 120 appeared in the statutes for the first time in the Patent Act of 1952. Prior to 1952, continuing application practice was a creature of patent office practice and case law, and 120 merely codified the procedural rights of an applicant with respect to this practice. . . . The legislative history of Section 120 does not indicate any Congressional intent to alter the Supreme Court's interpretation of continuing application practice." Transco Prods. Inc. v. Performance Contracting, Inc., 38 F.3d 551, 556-57, 32 USPQ2d 1077, 1081 (Fed. Cir. 1994). This practice was in existence when the Supreme Court decided Webster and Crown Cork; thus the defense of prosecution laches and the continuation practice coexisted. See Thomas G. Eshweiler, Ford v. Lemelson and Continuing Application Laches Revisited, 79 J. Pat. & Trademark Off. Soc'y 457 (1997).
 
 
 14
 There is nothing in the legislative history to suggest that Congress did not intend to carry forward the defense of prosecution laches as well. To the contrary, a careful reading of the history and commentary on the 1952 Act shows an intent to maintain the defense. Shortly after the passage of the Act, P.J. Federico, one of its original drafters, gave a series of lectures across the country to educate patent groups about the new Act. The lectures were transcribed, edited, and published. P.J. Federico, Commentary on the New Patent Act, 75 J. Pat. & Trademark Off. Soc'y 161 (1993) (reprinted from 35 U.S.C.A. 1954 ed.). Prior to publication, Federico "submitted drafts of the commentary to [Henry] Ashton and the Drafting Committee for suggestions . . ." Paulik v. Rizkalla, 760 F.2d 1270, 1277 (Fed. Cir. 1985) (en banc) (Rich, J., concurring). The Drafting Committee consisted of Judge Giles S. Rich, late of this court, and Paul Rose. See Giles S. Rich, Congressional Intent - Or, Who Wrote the Patent Act of 1952, in Patent Procurement and Exploitation (BNA 1963), reprinted in Nonobviousness - The Ultimate Condition of Patentability (John F. Witherspoon ed., 1980). Federico's commentary is an invaluable insight into the intentions of the drafters of the Act.
 
 
 15
 The defenses available to an accusation of infringement were incorporated into section 282 of the then new Act. "The defenses which may be raised in an action involving the validity or infringement of a patent are specified in general terms, by the second paragraph of section 282, in five numbered items. Item 1 specifies 'Noninfringement, absence of liability for infringement, or unenforceability' (the last word was added by amendment in the Senate for greater clarity); this would include the defenses such as that the patented invention has not been made, used, or sold by the defendant; license; and equitable defenses such as laches, estoppel and unclean hands." Commentary on the New Patent Act, 75 J. Pat. & Trademark Off. Soc'y at 215. See Mylan Pharm. Inc., v. Thompson, 268 F.3d 1323, 1331, 60 USPQ2d 1576 (Fed. Cir. 2001) (citing J.F. Stevens & Co. v. Lex Tex Ltd., 747 F.2d 1553, 1561, 223 USPQ 1089, 1093 (Fed. Cir. 1984) (Section 282 incorporates equitable defenses)). It is apparent from this that the drafters thought the defense of laches would be available. And precedent has since recognized the prosecution form of laches. See Pratt & Whitney Co. v. United States, 345 F.2d 838, 843-44 (Ct. Cl. 1965) (applying Webster to hold claims unenforceable).
 
 
 16
 3. Finally, Lemelson argues that we are bound by two of our non-precedential opinions under the reasoning in Anastasoff v. United States, 223 F.3d 898. Anastasoff held that Eighth Circuit Rule 28A(i) providing that unpublished decisions are not precedent and, therefore, not binding on future panels of that court violates Article III of the Constitution. It declared that the doctrine of precedent was "well-established" when the Framers drafted the Constitution and any exercise of the "judicial Power" is binding upon future panels because to depart from it would be "an approach to tyranny and arbitrary power, to the exercise of mere discretion, and to the abandonment of all the just checks upon judicial authority." 223 F.3d at 904. "A more alarming doctrine could not be promulgated by any American court, than that it was at liberty to disregard all former rules and decisions, and to decide for itself, without reference to the settled course of antecedent principles." Id.
 
 
 17
 However, we subscribe to the comprehensive, scholarly treatment of the issue in refutation of Anastasoff set out in Hart v. Massanari, 266 F.3d 1155, 1160 (9th Cir. 2001).* Article III of the Constitution does not contain an express prohibition on issuing non-precedential opinions, nor can we discern one from the existence of the state of the law when the Framers drafted it.
 
 
 18
 The concept of precedent could not have been incorporated into Article III because case reporters printing accurate versions of issued opinions were not first published until the middle of the nineteenth century. Anastasoff's restrictive view of the Framer's notions of precedent is far greater than was even possible at the relevant time period. Published opinions were rare and case reporters were often entrepreneurs who scribbled notes as the opinion was issued by the judge or assembled case reports from secondhand sources. See Hart, 266 F.3d at 1166, citing Robert C. Berring, Legal Research and Legal Concepts: Where Form Molds Substance, 75 Cal. L. Rev. 15, 18-19 (1987). Reporters were even known to alter or suppress cases they felt were wrongly decided. Id. at 1167, citing R.W.M. Dias, Jurisprudence, 33 (2d ed. 1964). Thus, reliable, accurate renditions of judicial decisions were not available when Article III was drafted.
 
 
 19
 Moreover, non-precedential opinions existed even before 1787 and the Framers reasonably could have contemplated the concept. As the volume of reported cases increased, commentators advised not reporting cases that did not contribute to the law for fear of an exponential growth in case law and the requirement to maintain it. Over three centuries ago, Sir Francis Bacon recommended to King James I that cases of "merely iteration and repetition" be omitted from the case reports; and Lord Coke had similarly complained about the existence of too much precedent at a time when there existed an estimated thirty volumes of cases. See Kirt Shuldberg, Digital Influence: Technology and Unpublished Opinions in the Federal Courts of Appeals, 85 Cal. L. Rev. 531, 545 (1997), citing John J. O'Connell, A Dissertation on Judicial Opinions, 23 Temp. L.Q. 13, 14 (1949); and Edward H. Warren, The Welter of Decisions, 10 Ill. L. Rev. 472 (1916).
 
 
 20
 This foretold a more modern lament over the sheer volume of reported cases. "The law library of the future staggers the imagination as one thinks of multitudes of shelves which will stretch away into the dim distance, rank upon rank, and tier upon tier, all loaded with their many volumes of precious precedents. One shrinks from the contemplation of the intellectual giants who will be competent to keep track of the authorities and make briefs in those days; they, as well as the judges who pass upon the briefs, must needs be supermen indeed." Shuldberg, 85 Cal. L. Rev. at 545, citing John B. Winslow, The Courts and the Papermills, 10 Ill. L. Rev. 157, 158 (1915). The Judicial Conference of the United States has confirmed this fear:
 
 
 21
 In view of the rapidly growing number of published opinions of the courts of appeals and of the district courts of the United States, and the ever increasing practical difficulty and economic cost of establishing and maintaining accessible private and public law library facilities, the Committee presented the following resolution which was approved by the Conference:
 
 
 22
 RESOLVED:That the judges of the courts of appeals and the district courts authorize the publication of only those opinions which are of general precedential value and that opinions authorized to be published be succinct.
 
 
 23
 Report of the Proceedings of the Judicial Conference of the United States, 11 (1964). Thereafter, the Judicial Conference in 1972 requested that all circuits develop an opinion publication plan. Report of the Proceedings of the Judicial Conference of the United States, 33 (1972). The result was the approval of "unpublished" decisions.
 
 
 24
 Unpublished, or as this court calls them, nonprecedential decisions do not give the judiciary free will to reinvent the law; they merely permit a judgment about whether a case contributes significantly to the body of law. See Fed. Cir. R. 47.6(b). They allow panels to determine if future panels and subordinate tribunals are to be bound by the ruling; the panel is still obligated to follow controlling precedent. This is a far cry from turning our back on precedent. Courts contribute to the growing imprecision, uncertainty and unpredictability of the law by issuing repetitive opinions on subjects that have been thoroughly irrigated. In our view, ideally once a principle has been established, it is up to the courts thereafter to apply it in cases coming before them and at most to explain their decisions to the parties, not to add to the explosion of legal opinions.** Accordingly, we decline to consider the nonprecedential cases cited by Lemelson.
 
 Conclusion
 
 25
 Accordingly, the judgment of the United States District Court for the District of Nevada is reversed and the case is remanded for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 *
 Because Judge Kozinski's opinion for the Hart court is so thorough, we need do little more than signal our agreement with it by synopsizing the main points.
 
 
 **
 This court is in its twentieth year. In that time the reported decisions of the courts of appeals have filled 575 volumes of the Federal Reporter.
 
 
 
 26
 NEWMAN, Circuit Judge, dissenting.
 
 REVERSED AND REMANDED
 
 27
 The Patent Act and implementing regulations authorize the filing of continuing applications provided that certain requirements are met. Heretofore, there has been no cause of action whereby a patentee who fully complied with the statute and rules must nonetheless defend the charge that he should have done more than the statute and rules require.
 
 
 28
 The rules for continuing applications have often been considered by practitioners, and were before Congress and the draftsmen of the 1952 Patent Act. The legal requirements for continuing applications embodied in 35 U.S.C. 120 and 121 do not warn that there will be serious risks of forfeiture to those who comply with these legal requirements. As the district court correctly held, "the court should not intervene in equity to regulate what Congress has not." Symbol, slip op. at 13; see Northwest Airlines, Inc. v. Transport Workers Union of America, 451 U.S. 77, 97 n.41 (1981) ("The equitable considerations advanced by petitioner are properly addressed to Congress, not to the federal courts."). Nonetheless, my colleagues on this panel have chosen to intervene, creating a new equitable cause of action called "prosecution laches." This judicial creation of a new ground on which to challenge patents that fully comply with the statutory requirements is in direct contravention to the rule that when statutory provisions exist they may be relied on without equitable penalty. Id. I must, respectfully, dissent.
 
 
 29
 The long-standing rule, until today, is that when the statutory requirements for continuing applications are met, patents are not subject to attack on non-statutory grounds. It simply adds to the uncertainties of the patent grant, to create a new cause of action whereby routine actions, in full statutory compliance, can years later be challenged as having been done too late or having taken too long. The consequences of this new cause of action of "prosecution laches" have not been explored, for this court is presented only with the concerns of those charged with infringing these Lemelson patents. However, the consequences are not limited to this case, but will open legally granted patents to a new source of satellite litigation of unforeseen scope, for the continuation practice is ubiquitous in patent prosecution.
 
 
 30
 The plaintiffs rely on two cases, decided in 1923 and 1924, which they say established the principle of laches in patent prosecution. These cases did not establish such a principle. In Woodbridge v. United States, 263 U.S. 50 (1923) the applicant waited nine years after the patent had been allowed by the Patent Office and given a statutory one-year delay in issuance, before calling the non-issuance to the attention of the Patent Office and requesting issuance with changes. The Court held that Woodbridge had waited too long. Indeed so; surely this is not "laches," for Woodbridge had already lost his statutory right to the patent. And in Webster Electric Co. v. Splitdorf Electrical Co., 264 U.S. 463 (1924) the applicant presented, in a divisional application, claims covering subject matter in an adverse patent, five years after issuance of the adverse patent, with which the applicant had previously lost an interference; a sequence that the Court struck down as "laches." In Crown Cork & Seal Co. v. Ferdinand Gutmann Co., 304 U.S. 159, 166-68 (1938) the Court made clear that Webster did not present a general requirement that divisional applications must be filed within two years after the issuance of the parent, or that claims must be presented within two years after issuance of an intervening patent.
 
 
 31
 Any doubt as to the reach of these cases was resolved in the 1952 Patent Act, which codified the rules for continuing and divisional applications. The codifiers undoubtedly recognized the many purposes served by the various statutory forms of continuing applications, for they chose not to place time limits on their use, beyond those placed by the statute. I take note that when the Patent Office sought to limit the number of continuations to three, the CCPA rejected that position; in In re Henriksen, 399 F.2d 253, 158 USPQ 224 (CCPA 1968), the court discussed the genesis of 120 and stated that the imposition of new limits on the continuation practice "is for Congress to decide." Id. at 262, 158 USPQ at 231.
 
 
 32
 Lemelson is not here charged with violation of 120 or 121. Nor is he charged with fraudulent conduct, deception, or other wrongdoing. The only charge is that, despite full compliance with statute and regulation, he took too long to present his claims.[1] This case is surely distinguished from Woodbridge, where a one-year delay that was authorized by statute became a nine-year forfeiture by the applicant. And it is surely distinguished from Webster, which was directed to interference practice and led to the one-year time limit for copying claims set in 35 U.S.C. 135(b).
 
 
 33
 I have no doubt that compliance with statutory law can lead to inequity in individual cases. However, unless one is prepared to abandon the rule of law in favor of subjective judicial preferences, when there is a statute it must prevail. This court has twice rejected the position now taken, in Bott v. Four Star Corp., 1988 WL 54107 (Fed. Cir. May 26, 1988) and Ricoh Co. v. Nashua Corp., 1999 WL 88969 (Fed. Cir. Feb 18, 1999),[2] the court pointing out that the statute authorized the continuation practice here criticized.
 
 
 34
 In Ricoh the court held that "absent congressional indication that intervening rights are to be applied in the context of continuation applications, we reject Nashua's argument that we should judicially adopt equitable safeguards, in contravention of established precedent, when Congress itself has declined to do so." 1999 WL 88969 at **3. In Bott the court observed that "we have not been directed to anything in the legislative history of the 1952 Act that supports Four Star's contention that the equitable considerations discussed in the Supreme Court cases relied on by Four Star [Webster and Crown Cork] should have continued viability." 1998 WL 54107 at **1. The court cited In re Hogan, 559 F.2d 595, 604 n.15, 194 USPQ 527, 536 n.15 (CCPA 1977) ("It is immaterial under 35 U.S.C. 120 that the subject matter [of a claim in the continuing application] was not specifically claimed in the [parent] application.") and In re Henrikson, 399 F.2d at 262, 158 USPQ at 231 (the benefits of 120 are a matter of entitlement) in refusing to impose time restrictions on continuation practice.
 
 
 35
 Bott and Ricoh were designated "nonprecedential" and this court's permission to discuss them was granted "reluctantly." My colleagues on this panel decline to recognize them. While I fully agree that a court is allowed to and indeed must have the right to issue nonprecedential opinions, at a minimum these two opinions, the Federal Circuit's only word on the topic, point up the diversity of continuation practices. Other courts that have considered the matter have also declined to intervene into the statutory scheme for continuing applications. See, e.g., Progressive Games Inc. v. Amusements Extra Inc., 51 USPQ2d 1849 (D. Colo. 1999); Ford Motor Co. v. Lemelson, 42 USPQ2d 1706 (D. Nev. 1997); Advanced Cardiovascular Sys. v. Medtronic Inc., 41 USPQ2d 1770 (N.D. Cal. 1996); Price v. Code-Alarm Inc., 26 USPQ2d 161 (N.D. Ill. 1992). All of these decisions reinforce the position that the court should stick with the statute, and that any further restraint should be by statutory change.[3]
 
 
 36
 The panel majority states that equitable defenses are by statute available in infringement actions. Indeed they are. See 35 U.S.C. 282. However, the issue here is not the defense of laches to the tort of infringement; it is whether a statutorily authorized action nonetheless can render the patent permanently unenforceable. My concern is with the court's ruling that an applicant's full adherence to statutory procedures can nonetheless deprive the applicant, retrospectively, of a property right that was granted in accordance with law. Lest authorized acts of patent prosecution be forever tainted by the potential defense that they should have been done sooner than the statute required, we should adhere to the statute. In United States v. American Bell Tel. Co., 167 U.S. 224, 247 (1897) the Court stated: "No court can disregard any statutory provisions in respect to these matters on the ground that in its judgment they are unwise or prejudicial to the interests of the public." As the Court explained, an inventor is not "under a sort of moral obligation to see that the public acquires the right to the free use of that invention as soon as is conveniently possible." Id. at 250.
 
 
 37
 The district court here correctly held that it "is improper to introduce the equitable doctrine of laches into the statutory scheme of continuation practice." Symbol, slip op. at 13. The issue now before us has been considered in various legislative proposals and rejected. It is inappropriate for this court, under the guise of equity, to change the law and adopt the position that was rejected by the Congress. Our precedent has acknowledged that "a limit upon continuing applications is a matter of policy for the Congress, not for us . . . . The law set forth in 35 U.S.C. 112 and 120 is the same for all applications, whether of long or short pendency." Hogan, 559 F.2d at 604 n.13, 194 USPQ at 536 n.13. We should lay to rest this new source of uncertainty and variability in continuation practices, lest we insert a taint into every patent that has invoked these statutory procedures.
 
 
 
 Notes:
 
 
 [1]
 Although the merits of the asserted "prosecution laches" are not before us, we take note of the declaratory plaintiffs' continuing reference to "submarine" patents. The limited record provided to us shows that Lemelson's original patents, filed in 1954 and 1956, issued in 1962 and 1963, and thus expired in 1979 and 1980. The record also shows that ten divisional patents were subject to terminal disclaimers, one of which has a life of only one year and another of four years. The record shows that other patents are continuations-in-part. Both sides outline their positions: the plaintiffs allege that Lemelson has unfairly enlarged the scope of his original patents and is unreasonably threatening suit, while Lemelson answers that his first patents issued long ago and are expired, that any later claims not patentably distinct are subject to attack on the established grounds of invalidity or terminal disclaimer, and that all of his filings complied with the statute.
 
 
 [2]
 These nonprecedential opinions were permitted to be discussed in this case on Lemelson's motion.
 
 
 [3]
 The statute has indeed been changed. In connection with the Uruguay round of the General Agreement on Tariffs and Trade the United States agreed to limit the life of all future patents to twenty years from the filing of the earliest application from which priority is claimed. This change was made as an accommodation to international patent harmonization in the context of world trade. However, despite urging by interests including these plaintiffs, the change was not made applicable to existing patents or to pending applications filed before June 8, 1995. The present ruling will achieve the retroactive effect that was legislatively rejected.