**INTUITIVE SURGICAL, INC. and International Business Machines Corporation, Plaintiffs,**

v.

**COMPUTER MOTION, INC., Defendant.**

No. Civ.A. 01–203–SLR.

United States District Court, D. Delaware.

July 30, 2002.

Thomas L. Halkowski, John T. Meli, Jr., Fish & Richardson, P.C., Wilmington, DE, Counsel for plaintiff, Intuitive Surgical, Inc., of counsel, Frank E. Scherkenbach, Fish & Richardson, P.C., Boston MA, Susan E. Emrich, Todd G. Miller, Fish & Richardson, P.C., San Diego, CA.

Jesse E. Finkelstein, Robert W. Whetzel, Richards, Layton & Finger, Wilmington, DE, Counsel for plaintiff, International Business Machines Corporation, of counsel, Raymond A. Kurz, Celine Jimenez Crowson, David A. Kikel, Hogan & Hartson, L.L.P., Washington, DC.

Josy W. Ingersoll, Adam W. Poff, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, Counsel for defendant, of counsel, Jan P. Weir, Julie McCoy Akins, Steven M. Hanle, Stradling Yocca Carlson & Rauth, Newport Beach, CA.

## MEMORANDUM OPINION

ROBINSON, Chief Judge.

## I. INTRODUCTION

On March 30, 2001, plaintiffs Intuitive Surgical, Inc. ("Intuitive") and International Business Machines Corporation ("IBM") filed this action against defendant Computer Motion, Inc. alleging infringement of certain claims of United States Patent No. 6,201,984 (the " 984 patent"). (D.I.1) On May 17, 2001, defendant filed counterclaims seeking a declaratory judgment of noninfringement, invalidity and unenforceability. (D.I.11) The court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201 and 2202. Currently before the court are various motions for summary judgment. For the following reasons, the court shall deny defendant's motions for summary judgment for lack of standing (D.I.168), lack of enablement (D.I.170) and failure to disclose the best mode (D.I.171), and the parties' motions on prosecution laches. (D.I.169, 0–1) The court shall grant in part and deny in part plaintiffs' motion for literal infringement. (D.I.173)

## II. BACKGROUND

### A. The Parties

IBM is the assignee of the 984 patent, entitled "System and Method for Augmentation of Endoscopic Surgery." Intuitive and defendant are engaged in the development, manufacture, marketing and sale of robotic devices for use in minimally invasive endoscopic surgery. Intuitive holds a license to the 984 patent and manufactures the da Vinci Surgical System. Defendant manufactures the AESOP, ZEUS Surgical System and HERMES Control Center.

### B. Prosecution History of the 984 Patent

The 984 patent resulted from patent application Serial No. 09/325,761 (the " 761 application"), which is a continuation of application No. 07/889,215 (the " 215 application"), filed on May 27, 1992. (D.I. 214 at 157) The 215 application was filed with 36 original claims, each of which was limited to the use of image processing to determine the position of the surgical instrument within the patient. (*Id.* at 158)

In an Office Action dated September 27, 1993, the examiner found that the 215 application contained four distinct inventions, and required IBM to elect one set of claims and file three additional "divisional" applications, all of which would maintain a May 27, 1992 priority date. (*Id.*) IBM elected claims 1–17, which issued on May 23, 1995 as United States Patent No.

5,417,210. (*Id.* at 159) On January 26, 1995, IBM filed three divisional applications for the remaining claims of the 215 application. The divisional application that contained claims 25, 26, and 34–36 issued as United States Patent No. 5,572,999 (the "999 patent") on November 12, 1996. The divisional application that contained claims 28–33 issued as United States Patent No. 5,749,362 on May 12, 1998. (*Id.* at 159–60)

The divisional application that led to the 984 patent (the 761 application) contained claims 18–24, 27 and 37–60 of the 215 application. (*Id.* at 161) For the first time, IBM submitted to the PTO a set of "voice recognition" and "speech synthesis" claims in an amendment to the 761 application dated May 14, 1999. (D.I. 225, Ex. 3; D.I. 214 at 166–67) In September 1999, IBM filed a "Third Preliminary Amendment," amending certain claims and adding others. (D.I. 225, Ex. 4; D.I. 214 at 161) On December 10, 1999, having not heard anything from the PTO since January 26, 1995,[1] IBM's patent attorney submitted a Status Request regarding the 761 application, which stated:

> Applicants request status of the above-identified application. To date, attorneys for Applicants have not yet received any Action from the U.S. Patent Office. The last item received from the U.S. Patent Office was the Official Filing Receipt mailed **September 8, 1999.** Applicants submitted a Third Preliminary Amendment for which the return postcard was stamped as received on September 16, 1999 **(copy of the postcard is enclosed).** Applicants also submitted an Information Disclo-

sure Statement on October 15, 1999 which was acknowledged as received by the U.S. Patent & Trademark Office on October 18, 1999 **(copy of the postcard is enclosed).**

> Please advise us of the current status of this application.

(D.I. 225, Ex. 5 (emphasis in original); D.I. 214 at 161) On March 28, 2000, the examiner rejected all of the pending claims because of double patenting over claims 1–7 of the 999 patent. (D.I. 225, Ex. 9; D.I. 214 at 161) The examiner stated:

> The subject matter claimed in the instant application is fully disclosed in the patent and is covered by the patent since the patent and the application are claiming common subject matter, as follows: a surgical instrument having a proximal and a distal end and extendable into a surgical site, a robot supporting the proximal end of the surgical instrument and moving the surgical instrument in response to motor signals, an input device comprising a voice recognition system for inputting instructions and a computer coupling the input device to the robot and generating the motor control signals controlling the robot. Furthermore, there is no apparent reason why applicant was prevented from presenting claims corresponding to those of the instant application during prosecution of the application which matured into [the 999] patent.

(D.I.225, Ex. 9) In response to the examiner's rejection, IBM filed a terminal disclaimer limiting the term of the 984 patent to that of the 999 patent.[2] (D.I.225, Ex. 11)

---

1. It is undisputed that the 761 application file was misplaced by the PTO for several years. In an exhibit to the December 22, 1997 licensing agreement between IBM and Intuitive, the 761 application (designated as "0000000000") is noted as having a "filing receipt problem being resolved with the USPTO." (D.I. 214 at 229)

2. IBM subsequently limited the term of the 984 patent to 17 years from the issue date of the earliest patent to which it claims priority

The examiner further rejected certain claims for indefiniteness under 35 U.S.C. § 112 and anticipation under 35 U.S.C. § 102 based on United States Patent No. 5,402,801, which issued to IBM from parent application No. 07/714,816 (the " 816 application"), filed on June 13, 1991. (D.I. 214 at 162; D.I. 225, Ex. 9) On May 17, 2000, IBM amended certain claims and converted the 761 application into a continuation-in-part of the 816 application, thereby claiming the filing date of the 816 application. (D.I.225, Ex. 10) A Notice of Allowability was mailed on August 8, 2000 and the 984 patent issued on March 13, 2001. (D.I.225, Ex. 12)

### C. IBM's License to Intuitive

The '984 patent is one of many patents licensed to Intuitive by IBM under a written license agreement dated December 22, 1997 (the "License Agreement"). The License Agreement pertains to two groups of patents owned by IBM: the "LARS Patents" and the "ROBODOC Patents." The 984 patent is one of the LARS Patents, all of which relate to methods for the augmentation of endoscopic surgery. The License Agreement provides, in pertinent part:

> IBM has the right to license others under certain patents and patent applications relating to systems and methods for the augmentation of surgery. INTUITIVE desires to acquire an exclusive license under those patents and patent applications.

.    .    .    .    .

2.1 After the Effective Date and upon receipt of the payment of Section 4.1,

IBM agrees to grant and hereby grants to INTUITIVE an exclusive (subject to Sections 2.3 and 2.4), revocable (upon termination per Section 9 [3]), worldwide right (with the right to grant sublicenses thereunder) under the LARS Patents to make, have made for INTUITIVE, use, import, offer for sale, sell and/or otherwise transfer INTUITIVE Licensed Products and Services in the Field.

2.2 After the Effective Date and upon receipt of the payment of Section 4.1, IBM agrees to grant and hereby grants to INTUITIVE a nonexclusive revocable (upon termination per Section 9), worldwide right (without the right to grant sublicenses thereunder except as provided in Section 3) under the LARS Patents to make, have made for INTUITIVE, use, import, offer for sale, sell and/or otherwise transfer INTUITIVE Licensed Products and Services outside the Field.

2.3 The license of Section 2.1 is subject to a reserved right in IBM and its Subsidiaries to practice the LARS Patents in its and their own facilities for research, development, testing and engineering for any purpose and for the manufacture and sale of IBM products and the provision of IBM services, other than for IBM products and services within the Field.

2.4 INTUITIVE acknowledges that IBM has previously licensed the right to practice the inventions claimed in the LARS Patents to the entities identified in the letter [4] dated December 18, 1997, from A.M. Torressen (IBM) to K.I.

---

(the 309 patent) giving it an expiration date of January 18, 2011. (D.I.197, Ex. 64)

**3.** Section 9 provides grounds for termination if Intuitive fails to make any of the required payments set forth in Sections 4.1 through 4.4 of the License Agreement. Intuitive has already made all of the payments required un-

der the License Agreement. (D.I. 195 at ¶ 4; D.I. 196 at ¶ 8)

**4.** This letter lists twenty-four different entities that also have received licenses from IBM to the LARS Patents. (D.I.214, Ex. 6C)

McAusland (INTUITIVE) for use in "Information Handling Systems", but otherwise without restriction as to field, and accepts the license of Section 2.1 above subject to these identified prior licenses. IBM shall exclude the LARS Patents from all patent licenses IBM enters into with third parties after the Effective Date except for specific licenses which may be granted by IBM outside the Field. Intuitive further acknowledges that IBM is negotiating the grant of license rights under the LARS Patents outside the Field with Integrated Surgical Systems.

.        .        .        .        .

5.1 INTUITIVE shall have the right but not the obligation to enforce the LARS Patents and the ROBODOC Patents in the Field, at INTUITIVE's expense. IBM agrees to cooperate with such enforcement efforts as necessary. INTUITIVE agrees to reimburse IBM for its reasonable expenses incurred in connection with such cooperation. IF IBM becomes aware of infringement of the LARS Patents or the ROBODOC Patents inside the Field and believes that enforcement of the patents is required in order to protect the value of the patents in the face of the infringement, then IBM shall submit a written request for enforcement of the patents to INTUITIVE. INTUITIVE shall respond to IBM within sixty (60) days indicating whether INTUITIVE will enforce the patents against the alleged infringer. In the event that INTUITIVE declines to enforce the patents,

and IBM disagrees with that position, INTUITIVE's CEO shall meet, upon IBM's request, with IBM's Vice President of Intellectual Property and Licensing to further discuss the necessity and advisability of enforcement against the alleged infringer.

.        .        .        .        .

10.2 Except as provided in Sections 9.3 or 9.4,[5] INTUITIVE shall not assign this Agreement, nor any of its rights or privileges, nor delegate any of its duties or obligations, thereunder, under any circumstances, without the prior written consent of IBM. Any attempt to do so shall be void. However, notwithstanding the foregoing, INTUITIVE may grant sublicenses under the LARS Patents as provided in Sections 2.1, 2.2, 2.5 and 2.6 without the prior written consent of IBM.

(D.I.214, Ex. 6B)

The License Agreement defines the following terms:

1.5 "Field" shall mean Surgery performed in the practice of animal and human medicine, with or without an Endoscope; *provided, however,* the medical fields of neurology, ophthalmology and orthopedics, and all Surgery practiced in those medical fields, and Biopsy procedures are excluded from the Field.

1.11 "Surgery" shall mean operation on or manipulation of tissue for the treatment of disease, injury or deformity.

1.2 "Biopsy" shall mean the removal and microscopic examination of tissue

---

5. Sections 9.3 and 9.4 provide, in pertinent part:

9.3 In the event that fifty percent (50%) or more of the outstanding shares or securities ... of INTUITIVE are or become owned or controlled ... by a third (acquiring) party, INTUITIVE shall promptly give written notice of such acquisition to IBM....

9.4 In the event that INTUITIVE is a party to a merger, consolidation, amalgamation or other combination with another entity ... such that INTUITIVE will cease to exist as a legal entity following such event, INTUITIVE shall promptly give written notice of such even to IBM....

(D.I.214, Ex. 6B)

taken from a living body and performed to establish an exact diagnosis.

1.7 "Information Handling System" or "IHS" shall mean any instrumentality or aggregate of instrumentalities primarily designed to compute, classify, process, transmit, receive, retrieve, originate, switch, store, display, manifest, measure, detect, record, reproduce, handle or utilize any form of information, intelligence or data for business, scientific, control or other purposes.

(D.I.214, Ex. 6B) (emphasis in original)

### D. The Accused Products

The accused products in this action are defendant's AESOP 3000, AESOP 3000HR, ZEUS Microjoint ("ZEUS MJ") and ZEUS Microwrist ("ZEUS MW"), and defendant's HERMES Control Center used in conjunction with the AESOP 3000HR or ZEUS MW.

The current version of the AESOP[6] robotic surgical system, the AESOP 3000, is a computerized robotic system designed to maneuver and position an endoscope[7] under the direct control of the surgeon. AESOP 3000 has a positioning arm that holds the endoscope and mimics the movement of a human arm. The arm is connected to a computer controller that recognizes and processes voice movement commands issued by the surgeon into corresponding movements of the positioning arm and its endoscope. The AESOP 3000HR contains the AESOP 3000 positioning arm along with a "HERMES-ready" computer controller, designed to be compatible with the HERMES Control Center. (D.I. 214, Ex. 1 at ¶ 5)

The ZEUS Robotic Surgical System is a computerized system for minimally invasive surgery comprised of three robotic arms, an AESOP 3000 positioning arm (which holds the endoscope) and two additional arms to hold and manipulate surgical instruments. The ZEUS System consists of a computer controller and a console at which the surgeon sits to direct the motions of the three mechanical arms. The surgical endoscope may be moved by means of voice commands, while the other arms are moved with hand controls. ZEUS MJ is a standalone system, whereas ZEUS MW is designed for use with the HERMES Control Center. (*Id.* at ¶ 14; D.I. 177, Exs. 26–30)

The HERMES Control Center is a centralized system that enables a surgeon to use voice commands to control the operation of a network of "HERMES-ready" medical devices in the operating room, including tables, lights, cameras and surgical instruments. (*Id.* at ¶ 17)

### III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Facts that could alter the outcome are 'material,' and

---

6. "AESOP" is an acronym for "Automated Endoscope System for Optimal Positioning." (D.I. 174 at 10, n. 11)

7. An endoscope is a slender optical tube used in minimally invasive surgery, which is passed into a patient's body allowing the surgeon to view the inside of the patient on a video monitor. (D.I. 214, Ex. 1 at ¶ 5)

disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV. DISCUSSION

### A. Intuitive's Standing to Sue

■ Standing in a patent infringement case is derived from the Patent Act, which provides that "[a] patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. The term "patentee" comprises "not only the patentee to whom the patent was issued but also the successors in title to the patentee." 35 U.S.C. § 100(d). An exclusive licensee may bring suit in its own name if the exclusive licensee holds "all substantial rights" in the patent. *Textile Prods., Inc. v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed. Cir.1998); *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 875 (Fed.Cir.1991). *See also Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed.Cir. 2001) ("A grant of all substantial rights in a patent amounts to an assignment—that is, a transfer of title in the patent—which confers constitutional standing on the assignee to sue another for patent infringement in its own name.") (citations omitted). "An exclusive licensee that does not have all substantial rights has standing to sue third parties only as a co-plaintiff with the patentee." *Textile Prods.*, 134 F.3d at 1484.

> Conversely, a nonexclusive license or "bare" license—a covenant by the patent owner not to sue the licensee for making, using, or selling the patented invention and under which the patent owner reserves the right to grant similar licenses to other entities—confers no constitutional standing on the licensee under the Patent Act to bring suit or even to join a suit with the patentee because a nonexclusive (or "bare") licensee suffers no legal injury from infringement.... An exclusive licensee receives more substantial rights in a patent than a nonexclusive licensee, but receives fewer rights than an assignee of all substantial patent rights.

*Intellectual Prop. Dev.*, 248 F.3d at 1345 (citations omitted).

To determine whether an agreement transfers all or fewer than all substantial patent rights, a court must ascertain the intention of the parties and examine the substance of what was granted by the licensing agreement. *See Vaupel*, 944 F.2d at 874. Standing cannot be "inferred

argumentatively from averments in the pleadings," *Grace v. Am. Cent. Ins. Co.,* 109 U.S. 278, 284, 3 S.Ct. 207, 27 L.Ed. 932 (1883), but rather "must affirmatively appear in the record," *Mansfield, C. & L.M.R. Co. v. Swan,* 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884). The party asserting that it has all substantial rights in the patent "must produce ... written instrument[s] documenting the transfer of proprietary rights." *Speedplay, Inc. v. Bebop, Inc.,* 211 F.3d 1245, 1250 (Fed.Cir. 2000).

The question before the court is whether IBM granted Intuitive sufficient rights in the 984 patent for Intuitive to be considered an "exclusive licensee" rather than a "bare licensee." In *Abbott Labs. v. Diamedix Corp.,* 47 F.3d 1128 (Fed.Cir.1995), the Federal Circuit determined that a transfer of certain, but not all, patent rights from Diamedix to Abbott constituted an exclusive license. In that case,

> Diamedix retained the right to make and use, for its own benefit, products embodying the inventions claimed in the patents, as well as the right to sell such products to end users, to parties with whom Diamedix had pre-existing contracts, and to pre-existing licensees. Abbott's exclusive license was also made subject to prior licenses granted by Diamedix. Moreover, although Abbott was given the right of first refusal in suing alleged infringers, the agreement provides that if Diamedix asks Abbott to bring suit against an alleged infringer and Abbott declines to do so, Diamedix has the right to prosecute its own infringement action; thus, although Abbott has the option to initiate suit for infringement, it does not enjoy the right to indulge infringements, which normally accompanies a complete conveyance of the right to sue. In addition, even if Abbott exercises its option to sue for infringement, it is obligated under the

agreement not to "prejudice or impair the patent rights in connection with such prosecution or settlement." Finally, the parties appear to have contemplated that Diamedix could participate in a suit brought by Abbott, because the agreement provides that Diamedix is "entitled to be represented therein by counsel of its own selection at its own expense."

*Id.* at 1132. Diamedix also retained the right to prevent Abbott from assigning its rights under the license to any party other than a successor in business. *Id.*

Pursuant to the License Agreement at issue, Intuitive holds an exclusive, worldwide license to practice the '984 patent in certain surgical fields, subject only to prior licenses and IBM's right to practice the patent for research and development purposes. IBM will refrain from granting new licenses to the '984 patent. Intuitive possesses the right to grant sublicenses under the patent, but cannot assign the license to anyone except successors-in-interest without the prior consent of IBM. Intuitive has the right but not the obligation to enforce the '984 patent, and promises to reimburse IBM for any expenses it incurs from cooperation with Intuitive's enforcement measures. If Intuitive declines to enforce the '984 patent and IBM disagrees with that position, Intuitive promises to meet with IBM executives to discuss the matter, but the License Agreement does not give IBM the right to bring its own enforcement action. The court finds that IBM retained similar, if not fewer, substantial rights in the '984 patent than did Diamedix in *Abbott Labs,* whom the Federal Circuit determined had conveyed an exclusive license to Abbott. Thus, IBM granted Intuitive sufficient rights in the '984 patent for it to be considered an "exclusive licensee," and Intuitive has standing to pursue this action as co-plaintiff with IBM.

## B. Literal Infringement

■ Plaintiffs argue that defendant's AESOP 3000, AESOP 3000HR, ZEUS MW and ZEUS MJ infringe claims 1, 2, 6, 13 and 14 (the "asserted claims")[8] of the '984 patent, and that defendant's HERMES Control Center also infringes those claims when used in conjunction with AESOP 3000HR and ZEUS MW. A determination of infringement requires a two-step analysis. First, the court must construe the asserted claims so as to ascertain their meaning and scope. Second, the claims as construed are compared to the accused product. *See KCJ Corp. v. Kinetic Concepts, Inc.,* 223 F.3d 1351, 1355 (Fed.Cir.2000). Claim construction is a question of law while infringement is a question of fact. *See id.* To establish literal infringement, "every limitation set forth in a claim must be found in an accused product, exactly." *Southwall Tech., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1575 (Fed.Cir.1995). Occasionally, "the issue of literal infringement may be resolved with the step of claim construction, for upon correct claim construction, it may be apparent whether the accused device is within the claims." *Multiform Desiccants, Inc. v. Medzam,* 133 F.3d 1473, 1476 (Fed. Cir.1998).

■ The only disputed issue before the court is whether the accused products contain the "voice recognition system" limitation of the asserted claims. The court has construed "voice recognition system" to mean:

The surgical robotic system contains an apparatus into which the surgeon speaks verbal instructions. These terms are not limited to the structure of any embodiment described in the specification. (D.I.238) The parties agree that the accused products "contain[ ] an apparatus into which the surgeon speaks verbal instructions," as they are designed to recognize and process a surgeon's voice commands. Thus, plaintiffs' motion for summary judgment that the accused products literally infringe claims 1, 2, 6, 13 and 14 of the '984 patent is granted.[9]

## C. Prosecution Laches

Defendant argues that the '984 patent should be declared unenforceable pursuant to the equitable doctrine of prosecution laches, which enables a court to bar enforcement of a patent claim that issued after an "unreasonable and unexplained delay" in prosecution, even though the applicant complied with pertinent statutes and rules. *Symbol Techs., Inc. v. Lemelson Medical, Education and Research Foundation, L.P.,* 277 F.3d 1361, 1363 (Fed.Cir.2002). Prosecution laches may also be applied to new claims issuing from divisional and continuing applications that prejudice intervening adverse public rights. *See id.* at 1364 (citing *Crown Cork & Seal Co. v. Ferdinand Gutmann Co.,* 304 U.S. 159, 58 S.Ct. 842, 82 L.Ed. 1265 (1938); *Gen. Talking Pictures Corp. v. W. Elec. Co.,* 304 U.S. 175, 304 U.S. 546, 58 S.Ct. 849, 82 L.Ed. 1273 (1938)). The court declines to make a determination on the issue of prosecution laches without the

8. Although plaintiffs contend that the accused products infringe virtually all of the 50 claims of the '984 patent, plaintiffs have chosen a representative set of claims for the purposes of their motion for summary judgment of literal infringement.

9. The court finds that there exist genuine issues of material fact regarding defendant's

knowledge and intent as these issues apply to plaintiffs' claims of inducement of infringement and contributory infringement. The court also declines to address defendant's claim that the reverse doctrine of equivalents applies to the court's finding of literal infringement based on the record presented.

benefit of a complete factual record. Thus, the court shall deny the parties' motions for summary judgment, and shall permit the parties to present evidence on prosecution laches to the court.

### D. Enablement

■ An issued patent is presumed valid. *See* 35 U.S.C. § 282. In order to overcome this presumption, the party challenging validity bears the burden of proving by clear and convincing evidence that the invention fails to meet the requirements of patentability. *See Hewlett–Packard Co. v. Bausch & Lomb*, 909 F.2d 1464, 1467 (Fed. Cir.1990). Clear and convincing evidence is evidence that "could place in the ultimate fact finder an abiding conviction that the truth of [the] factual contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984).

The enablement requirement of 35 U.S.C. § 112 demands that the patent specification enable "those skilled in the art to make and use the full scope of the claimed invention without 'undue experimentation.'" *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed.Cir. 1997) (quoting *In re Wright*, 999 F.2d 1557, 1561 (Fed.Cir.1993)).

> The enablement requirement ensures that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims. The scope of the claims must be less than or equal to the scope of the enablement. The scope of enable-

ment, in turn, is that which is disclosed in the specification plus the scope of what would be known to one of ordinary skill in the art without undue experimentation.

*Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1196 (Fed.Cir.1999). Enablement is a question of law based on underlying factual inquiries. *See Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1369 (Fed.Cir.1999).

In the case at bar, defendant contends that the '984 patent is invalid because its specification lacks a sufficiently full and clear description of voice recognition and speech synthesis to enable persons of ordinary skill in the art to make and use the claimed invention without undue experimentation. Plaintiffs argue that the '984 patent disclosure is enabling, based on an expert's opinion and the available technology and level of ordinary skill at the time of the patent application. The court concludes that there exist genuine issues of material fact as to whether the '984 patent is invalid for failure to comply with the enablement requirement and, therefore, shall deny defendant's motion for summary judgment.

### E. Best Mode

■ Defendant also contends that the '984 patent is invalid because its specification has failed to "set forth the best mode contemplated by the inventor of carrying out his invention," also required by 35 U.S.C. § 112.[10] Determining whether a patent complies with the best mode re-

---

10. The enablement and best mode requirements are distinct conditions for patentability under 35 U.S.C. § 112.

> Enablement looks to placing the subject matter of the claims generally in the possession of the public. Best mode looks to whether specific instrumentalities and techniques have been developed by the inventor and known to him at the time of filing as

the best way of carrying out the invention. The enablement requirement, thus, looks to the objective knowledge of one of ordinary skill in the art, while the best mode inquiry is a subjective, factual one, looking to the state of the mind of the inventor.

*Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1050 (Fed.Cir.1995) (internal citations and quotations omitted).

quirement involves two underlying factual inquiries. First, it must be determined whether, at the time the patent application was filed, the inventor had a best mode of practicing the claimed invention. *See Chemcast Corp. v. Arco Indus. Corp.*, 913 F.2d 923, 927–28 (Fed.Cir.1990). This inquiry is wholly subjective and addresses whether the inventor must disclose any facts in addition to those sufficient for enablement. *See id.* at 928. Second, if the inventor had a best mode of practicing the claimed invention, it must be determined whether the specification adequately disclosed what the inventor contemplated as the best mode so that those having ordinary skill in the art could practice it. *See id.* at 928. The latter question is "largely an objective inquiry that depends upon the scope of the claimed invention and the level of skill in the art." *Id.* Due to the highly factual nature of this inquiry, the court declines to conclude, based on the record presented, that defendant has shown by clear and convincing evidence that the '984 patent is invalid for failure to disclose the best mode. Thus, the court shall deny defendant's motion for summary judgment on this ground.

## V. CONCLUSION

For the reasons stated, the court shall deny defendant's motions for summary judgment for lack of standing, lack of enablement and failure to disclose the best mode, and the parties' motions on prosecution laches. The court shall grant plaintiffs' motion for infringement as to literal infringement, and deny the motion as to the issues of inducement of infringement, contributory infringement and reverse doctrine of equivalents.