UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

)
GILBERT P. HYATT, )
)
Plaintiff, ) Civil Action No. 05-2310 (RCL)
) Civil Action No. 09-1864 (RCL)
Vv. ) Civil Action No. 09-1869 (RCL)
) Civil Action No. 09-1872 (RCL)
ANDREI IANCU, )
)
Defendant. )
)

MEMORANDUM OPINION, FINDINGS OF FACT,
' AND CONCLUSIONS OF LAW

I. BACKGROUND

Before the Court is the defendant’s asserted affirmative defense of prosecution laches in
the four above-captioned cases. Prosecution laches is an equitable doctrine that can hold patents
unenforceable when an applicant engages in unnecessary and unexplained delays in prosecuting a
patent. See In re Bogese, 303 F.3d 1362, 1367 (Fed. Cir. 2002); Symbol Technologies, Inc. v.
Lemelson Medical, 277 F.3d 1361, 1365-66 (Fed. Cir. 2002) (Symbol Techs. I); Woodbridge v.
United States, 263 U.S. 50, 56 (1923) (“It is a case of forfeiting the right to a patent by designed
delay.”).

Plaintiff Gilbert P. Hyatt is a prolific inventor who has received more than 70 issued patents
and has pending nearly 400 patent applications before the United States Patent and Trademark

Office (PTO), the federal agency responsible for examining patent applications and for granting
US. patents. 35 U.S.C. § 1 et seq. Andrei Jancu is the named defendant in these matters in his
official capacity as the Under Secretary of Commerce for Intellectual Property and the Director of
the PTO.’ Because of the nature and lengthy history of the actions at-hand, throughout this opinion
the Court refers to the defendant as “PTO.”

Mr. Hyatt brought these actions pursuant to 35 U.S.C. § 145 to obtain patents on four of
his patent applications following decisions in the Board of Patent Appeals and Interferences, now
known as the Patent and Trial Appeal Board (the “Board”).” Section 145 allows an applicant
dissatisfied with the decision of the Board to “have remedy by civil action” in district court, rather
than taking an appeal directly to the Federal Circuit. See also Kappos v. Hyatt, 566 U.S. 431
(2012). In a series of opinions issued August 23, 2016, the Court found genuine disputes of
‘material fact precluded simmary judgment in these’matters;* trials on the merits would be required
with respect to claims in three of the four applications.

After the Court resolved the summary judgment motions, the PTO moved to dismiss these
actions for prosecution laches. Def.’s Mot Dismiss, ECF No. 91. In that set of motions, PTO
argued that Hyatt’s conduct in prosecuting these four patent applications, as well as approximately
400 others, called for dismissal. Jd. at **8-9 (“Mr. Hyatt’s conduct in each application and across
his roughly 400 applications has been unreasonable, inexcusable, and warrants dismissal of his
pending claims under the equitable doctrine of prosecution laches.”). The PTO stressed that some

of the applications claim priority to patents over 45 years old, id. at *9, and that Hyatt bulk-filed

' Andrei Iancu has been automatically substituted for Joseph Matal in these actions under Fed. R. Civ. P. 25(d).

? Case number 05-cv-2310 relates to the 08/457,211 application (the 211 application); No. 09-cv-1864 relates to the

08/456,398 application (the °398 application); No. 09-cv-1869 relates to the 08/472,062 application (the °062.
application); and No. 09-cv-1872 relates to the 08/431,639 application (the °639 application). Al! docket citations

herein are to 05-cv-2310 unless otherwise specified.

3 At the time Mr. Hyatt filed the present cases, venue lay by statute with the District Court of the District of Columbia.

In 2011, Congress amended the venue provision of certain patent-related statutes, including §145, such that suits under

those sections are henceforth to be filed in the Eastern District of Virginia. Pub. L. 112-29, §9 (Sept. 16, 2011).

* See ECF No. 75 (05-cv-2310); ECF No. 71 (09-cv-1864); ECF No. 75 (09-cv-1869); ECF No. 72 (09-cv-1872).
approximately 400 photocopies of eleven applications in the days leading up to the effective date
of the General Agreement on Tariff and Trade (GATT) in June 1995.° Id. It noted an October 24,
1995 meeting, during which Mr. Hyatt agreed to focus each application on a different invention,
id. at 21, but that some twenty years later, in 2015, Mr. Hyatt revealed that he never had a “master
plan” for amending all 400 applications. /d. at **30-31. Mr. Hyatt, on the other hand, argued that
the PTO was responsible for extensive delay in adjudicating many of the applications, PI. Mot.
Dismiss, ECF No. 101 at **7-9, and made the case that he was entitled to discovery. Jd. at **37-
38.

On March 16, 2017, the Court found that genuine disputes of material fact required treating
the motions to dismiss as if they were for summary judgment, and denied them accordingly. ECF
No. 116. With leave of Court, the PTO subsequently amended its answers on leave of the Court
to assert prosecution laches as an affirmative defense. ECF No. 123.

The Court set the PTO’s affirmative defense of prosecution laches across all four actions
for a bench trial, which also would consider evidence relating to Mr. Hyatt’s approximately 400
pending applications. ECF No. 150. The PTO, bearing the burden of proof on the affirmative
defense of prosecution laches and upon agreement of the parties, presented its case-in-chief first.

During the five trial days beginning October 6, 2017, during which the PTO presented its
case in chief, the PTO presented the testimony of three witnesses: Robert A. Clarke, Gregory
Morse, and Stephen Kunin, its expert witness. The parties also introduced a number of exhibits.

Mr. Clarke has worked for the PTO for 27 years, and he is currently the editor of the Manual
of Patent Examining Procedure (“MPEP”), a 3,000-page collection of guidance material for use -

by patent examiners in the examination of patent applications. Trial Tr. 75:20-76:14 (Oct. 6, 2017

> The Court has addressed the GATT in previous memorandum opinions. Information about GATT and its impact on
patents is available in those opinions or at the websites of the PTO or WTO.
A.M. Session). He also spent 9 years examining patent applications, wrote an article on patent
procedure, taught more than 600 hours of classes to patent examiners, and served in the Office of
Patent Legal Administration (which drafts examination guidelines), as Chief of Staff for the PTO,
and as an Administrative Patent Judge. Trial Tr. 75:15—78:21, 81:20-83:16 (Oct. 6, 2017 A.M.
Session). Mr. Clarke has had no personal involvement in the examination of Mr. Hyatt’s patent
applications. In or around 2012, however, Mr. Clarke spent approximately three days reviewing
the file histories of approximately 80 of Mr. Hyatt’s patent applications that were then subject to
an undue delay action brought by Mr. Hyatt in the United States District Court for the Eastern
District of Virginia and offered a declaration attesting to certain facts about those patent
applications. See Trial Tr. 55:5—56:14 (Oct. 6, 2017 P.M. Session).

Mr. Morse is currently Supervisory Patent Examiner (“SPE”) of Art Unit 2615, which is
assigned to examine Mr. Hyatt’s pending patent applications. Mr. Morse has worked at the PTO
since 1992 and has been supervising the examination of Mr. Hyatt’s patent applications since
March 2013. Trial Tr. 72:19-75:3 (Oct. 10, 2017 A.M. Session). Before March 2013, Mr. Morse
had no involvement in the examination of Mr. Hyatt’s patent applications. Trial Tr. 47:14-49:5
(Oct. 11, 2017 P.M. Session).

Mr. Kunin, PTO’s retained expert, testified as to PTO patent policy, practice, and
procedure, and how the prosecution of the applications at-issue in these cases presented uniquely
difficult circumstances for the PTO. Mr. Kunin, an attorney with an engineering background and
over thirty years of service in the PTO, rose to very senior positions within the agency, including
spending ten years as its Deputy Commissioner for Patent Examination Policy. In that position he
provided administrative oversight to and coordinated the activities of several offices within the

PTO, and was responsible for the promulgation of patent examination guidelines and training
materials, DX-1486 at paras. 7-13. Mr. Kunin offered no opinion as to whether prosecution laches
should be applied to Mr. Hyatt’s cases.

At the close of the PTO’s case-in-chief, Hyatt moved for judgment pursuant to Federal
Rule of Civil Procedure 52(c). Hyatt argued four bases for his motion: 1) the PTO did not prove
that it provided Mr. Hyatt with adequate warnings of impending laches rejections; 2) the PTO
failed to prove any intervening rights of third-parties in the technologies claimed in the present
applications; 3) although the PTO may issue laches rejections, no such rejections are at issue in
these cases and the Patent Act displaced the equitable remedy of prosecution laches in the context
of a §145 action; and 4) assuming that an affirmative defense of prosecution laches is available in
a §145 action, the PTO failed to meet its burden of proving unreasonable and unexplained delay.

Upon consideration of the evidence and arguments presented during trial and the entire
records in these cases, and review of the relevant case law, the Court found the PTO failed to prove
unreasonable and unexplained delay that supports a finding of prosecution laches, and accordingly
granted Mr. Hyatt’s motion on his fourth proffered ground. The present opinion, including the

Court’s findings and conclusions, is issued pursuant to Federal Rule of Civil Procedure 52(a)(1).°

It. LEGAL STANDARD
a. Rule 52(c)
Federal Rule of Civil Procedure 52(c) permits the Court to enter judgment against a party
fully heard “on a claim or defense that, under the controlling law, can be maintained or defeated

only with a favorable finding on that issue.” Fed. R. Civ. P. 52(c). In determining a Rule 52(c)

6 In a separate Order, the Court granted PTO’s Motion for Leave to File its Corrected Response to Plaintiff's Proposed
Findings of Fact and Conclusions of Law [ECF No. 214]. The Court therefore treats ECF No. 214-1 as the PTO’s
operative Responsive filing.
motion, “a district court may not draw any special inferences in favor of the non-movant.” Burke
v. Record Press, Inc., 951 F.Supp.2d 26, 31 (D.D.C. 2013). However, if the party with the burden
of proof has failed to meet that burden by the conclusion of its case-in-chief, the district court is to

grant the motion against it. Cf id.

b. Patent Prosecution Laches

Although the government has asserted prosecution laches administratively, see, e.g., In re
Bogese, 303 F.3d 1362 (Fed. Cir. 2002), and both the government and private party litigants have
done so in, e.g., infringement actions, see, e.g., Woodbridge v. United States, 263 U.S. 50 (1923);
Symbol Techs. I, 277 F.3d 1361 (Fed. Cir. 2002), these four cases are the first in which the PTO
has asserted prosecution laches in actions before a district court under 35 U.S.C. §145.
“Prosecution laches is an equitable defense.” Cancer Research Tech. Ltd. V. Barr Labs., Inc., 625
F.3d 724, 728 (Fed. Cir. 2010).’ In its traditional articulation, the doctrine stands for the
proposition that an already issued patent “may be rendered unenforceable if it was obtained after
an unreasonable and unexplained delay in prosecution.” Jn re Bogese, 303 F.3d at 1367 (citing
Symbol Techs. [, 277 F.3d at 1365-66).

A pair of Federal Circuit opinions in 2002 concerning prosecution laches, and a 2012
Supreme Court case articulating district courts’ duties under §145, Kappos v. Hyatt, 566 U.S. 431
(2012), make clear the Court can consider the PTO’s affirmative defense of prosecution laches
here, where the PTO has issued neither a patent nor any laches warnings. In Symbol Techs. I, the
Federal Circuit upheld a district court’s authority to find prosecution laches in an infringement

case. Soon thereafter, that court affirmed the PTO’s authority to assert prosecution laches as a

7 This differs from standard laches, which “is an affirmative defense rather than a claim for equitable relief.” See
Foster, 733 F.2d at 90.
basis for rejecting a patent application. See In re Bogese, 303 F.3d at 1367. Because the PTO is
empowered to assert prosecution laches administratively, and because litigants may assert the same
before district courts, the affirmative defense ought also be available to the PTO in a §145 action.
Cf. id. (“[W]e see no basis for denying the power to the PTO itself that we have recognized exists
in the district courts in infringement actions. It necessarily follows that the PTO has the authority
to reject patent applications for patents that would be [otherwise unenforceable].”).

Further, under the Supreme Court’s ruling in Kappos v. Hyatt,® district courts can consider
new evidence not in the administrative record before the PTO from prosecution of a §145
plaintiff's antecedent patent application, and “the district court must make a de novo finding when
new evidence is presented on a disputed question of fact.” 566 U.S. at 434. This mandate for de
novo findings likewise opens the door'to new arguments concerning the evidence in the case, and
just as the PTO can accordingly raise new grounds for rejecting a §145 plaintiffs claims on the
merits in response to new evidence presented as to those claims, so too can the PTO raise an
affirmative defense for the district court to consider. See also Troy v. Samson Mfctrn’g Corp., 758
F.3d 1322 (Fed. Cir. 2014) (holding that, under Kappos v. Hyatt, new issues and arguments may
be presented to district courts in §145 and §146 actions). In that vein, the Court here exercised its
discretion to allow the PTO to amend its Answer to include an affirmative defense of prosecution
laches. ECF No. 122.

Although there is no case directly on-point regarding how a district court should analyze
prosecution laches as an affirmative defense in a §145 case, the contours of the doctrine previously
articulated in infringement suits and in reviews of agency administrative actions, are instructive.

“The doctrine [of prosecution laches] should be applied only in egregious cases of misuse of the

8 Mr. Hyatt’s application that gave rise to the Kappos v. Hyatt decision, 08/471,702, first litigated in this court, 09-
cv-901, has origins and ancestry largely in common with the applications at issue here.
statutory patent system.” Symbol Technologies, Inc. v. Lemelson Medical, 422 F.3d 1378, 1385
(Fed. Cir. 2005) (Symbol Techs. IN). In other situations not involving prosecution laches, the
Federal Circuit has cautioned, “The mere passage of time does not constitute laches.” Advanced
Cardiovascular Systems v. Scimed Life Systems, 988 F.2d 1157, 1161 (Fed. Cir. 1993). The
Supreme Court has held the same. United States v. American Bell Tel. Co., 167 U.S. 224, 246
(1897) (“The mere fact of delay does not, therefore, operate to deprive the inventor of his legal
rights.”). Indeed, lengthy patent application prosecutions have been held not to implicate
prosecution laches in many cases. See, e.g., Cancer Research, 625 F.3d at 728 (reversing finding
of prosecution laches, despite “eleven continuation applications, ten abandonments, and no
substantive prosecution for nearly a decade”); Studiengesellschaft Kohle mbH yv. Northern
Petrochem. Co., 784 F.2d 351, 352 (Fed. Cir. 1986) (per curium) (affirming district court's finding
of no laches despite prosecution period that lasted over twenty years); Regents of the Univ. of Cal.
v. Monsanto Co., 2005 WL 3454107, *25—26 (N.D. Cal. 2005) (finding the doctrine of prosecution
laches inapplicable despite the fact that twenty-four years had passed between the application filing
and patent issue); Koninklijke Philips Electronics N.V. v. Cinram Intern., Inc.,2012 WL 4074419,
*7 (S.D.N.Y. 2012) (prosecution laches inapplicable despite nearly 19 years between the
application filing and patent issue dates).

Rather than merely calculating the passage of time, delay must be unreasonable and
unexplained. To determine this, courts are to look to “the totality of the circumstances, including
the prosecution history of all of a series of related patents and overall delay in issuing claims.”
Symbol Techs. I, 422 F.3d at 1386. Further, prosecution laches principally looks to a patent
applicant’s conduct, not his intent; although evidence that an applicant intended to delay issuance

of a patent can be relevant, the absence of such intent does not forgive conduct that does, in fact
unreasonably and inexplicably delay examination of his application(s). See, e.g., Woodbridge, 263
U.S. at 56 (“This is not a case where evidence has to be weighed as to the purpose of the
inventor.”’).

Finally, whereas in an action between private parties a court will balance equities in its
analysis, see Symbol Techs. I, 422 F.3d at 1385, the Federal Circuit has elsewhere determined that
“a delay by the PTO cannot excuse the applicant’s own delay.” See In re Bogese, 303 F.3d 1362,
1369 (Fed. Cir. 2002). It is significant that each of those matters is somewhat distinct from the
instant cases in their present posture. The Symbol Techs. cases involved private parties litigating
issued patents, and in Bogese the Federal Circuit was reviewing an appeal from the Board’s
upholding administratively-issued prosecution laches rejections on an arbitrary and capricious
standard.

In a §145 action where the district court is making a de novo determination on the
evidentiary record before it and not the administrative record of the PTO, its review of the propriety
of applicants’ prosecution conduct in a §145 action is not done in light of any presumptions as to
the validity of PTO’s earlier actions. To the contrary, the same ground from which this Court
derives authority to entertain the PTO’s equity-based affirmative defense in the first instance, i.e.,
PTO’s broader administrative authority to reject patent applications, is relevant to an equitable
inquiry that necessarily concerns, in part, PTO’s failure or otherwise declining to exercise that
authority earlier. An adapted standard is therefore appropriate where, as here, a district court is
conducting a de novo analysis of PTO’s ex-post assertion of prosecution laches during litigation,
as opposed to during examination in which an applicant may have an opportunity to cure the
alleged inequitable conduct in response to an agency’s action or warning. While it remains that

any delay by the PTO does not excuse any unreasonable and unexplained delay by the applicant,
under the totality of the circumstances test PTO’s actions and omissions can likewise be considered
in determining the reasonableness of any delay actually attributable to the applicant, and the

applicant’s explanations therefor.

i. ANALYSIS

The PTO accuses Mr. Hyatt of inequitable prosecution conduct that caused unreasonable
and unexplained delay in the examination of his applications. PTO argues, inter alia, that the
following alleged factors contributed to unreasonable delay in examination: 1) the large number
of claims in and across Mr. Hyatt’s applications; 2) his amendment practice; 3) his alleged shifting
of claims; 4) numerous and complicated priority claims in Mr. Hyatt’s applications, including that
the claims of priority made it difficult for examiners to identify written description support; 5)
difficulties in identifying written description support for Mr. Hyatt’s claims due to challenges in
identifying priority dates for claims, the length of the applications, the incorporation by reference
of other applications, and unclear interconnections among claim elements; 6) double-patenting,
duplicate claims, and indistinct claims across the applications, including overlaps with claims in
applications pending before the Court; 7) prosecution of claims previously allowed in another
application (06/663,094, referred to as ‘the ‘094 application’); 8) reintroducing certain claims
previously lost in interference actions; and 9) delay in presenting the claims contained in his 1995
pre-GATT applications, including the four applications pending before this Court, which claim
priority to earlier-filed applications.

The Court does not doubt that Mr. Hyatt’s “GATT Bubble” applications (i.e., those filed
in the spring of 1995) have menaced the PTO for decades. They are long, highly technical, and

voluminous. But also true, and particularly telling for present purposes, is that many of Mr. Hyatt’s

10
applications spent an inordinate time in a proverbial Never-Never Land, during which he was not
allowed under PTO’s procedures to prosecute his applications further, until the PTO took certain
actions. As detailed further below and as PTO concedes, ECF No. 214-1 at *29, at least a nine-
year period thus does not factor into the Court’s laches analysis.

Unsurprisingly, the PTO’s approach at trial tracked very closely with its earlier motions to
dismiss for prosecution laches. ECF No. 91 (05-cv-2310); ECF No. 91 (09-cv-1864); ECF No. 94
(09-1869); ECF No. 93 (09-cv-1872). For example, the PTO spent most of its presentation
addressing facts concerning Mr. Hyatt’s approximately 400 applications not otherwise implicated
in the four cases before this Court, with a particular and peculiar emphasis on prosecution conduct
related to those applications that post-date the filing of the present actions in district court. The
obvious rationale for the PTO’s doing so is that PTO apparently understands the Federal Circuit’s
totality test to include consideration of all prosecution conduct as to all related applications,

® But, for reasons explained below, that sweeping

without temporal or procedural limitation.
construction cannot reasonably be applied to these cases. The PTO also relies upon representations
allegedly made at a meeting with Mr. Hyatt in 1995, but does not adequately establish a
corresponding duty by Mr. Hyatt to ease PTO’s burden as a result of that meeting. These and other

factors are detailed in the Court’s findings and conclusions below.

a. Findings of Fact

The Nature of the Cases and Mr. Hyatt’s Applications
Each of the applications at issue in these cases was filed before June 8, 1995, the effective

date of the Jaw that changed the term of a patent from 17 years after issuance to 20 years from the

° At the same time, however, the PTO objects to this Court making any findings as to those other 400 applications that
are not the subject to any of the four actions here. See, e.g., ECF no. 214-1 at *3, *16. This desire for the Court to
consider but not decide matters not directly before it permeated PTO’s entire litigation strategy.

1]
application date of the oldest application from which the application claims priority. This change
in the U.S. patent term was part of the implementation of the Uruguay Round of the General
Agreement on Tariff and Trade (“GATT”). See Trial Tr. 43:8-44:3 (Oct. 6, 2017 P.M. Session);
20:6-14 (Oct. 10, 2017 P.M. Session).

To address circumstances where an applicant had the right under U.S. patent law to file a
new patent application to pursue claims described in a specification that had already been filed
with the PTO (known as a “continuing application”), Congress required the PTO to promulgate
rules to provide applicants further examination of additional patent claims that claim priority from
pre-GATT applications without loss of patent term. Pub. L. No. 103-465, sec. 532(a)(1), §
532(a)(2), 108 Stat. 4809, 4984 (1994) (codified as amended at 35 U.S.C. § 154). The PTO’s rule
implementing this legislation is in 37 C.F.R. § 1.129 (“Rule 129”), which was promulgated on
April 25, 1995. See 60 Fed. Reg. 20,195, 20,226—27 (Apr. 25, 1995) (“Changes to Implement 20-
Year Patent Term and Provisional Applications”); see also Trial Tr. 45:18-47:9 (Oct. 6, 2017 P.M.
Session) (addressing Rule 129).

To preserve the opportunity to obtain a 17-year term for patents based on pre-GATT
applications, many applicants filed a large number of patent applications during the brief period
between the promulgation of Rule 129 in April 1995 and the date on which the new patent term
law went into effect, June 8, 1995. The surge in applications filed during this period is known as
the “GATT Bubble.” Trial Tr. 104:17-107:21 (Oct. 6, 2017 P.M. Session).

Mr. Hyatt’s GATT Bubble applications filed in 1995, including the four applications
pending before the Court, were continuing applications that claim the benefit of earlier-filed parent
applications under 35 U.S.C. § 120. Their claims also claim the benefit of the date of the earliest-

filed parent application whose specification provides support for the claims.

12
Mr. Hyatt’s GATT Bubble applications differed in number and size from those filed by
most other applicants. Mr. Hyatt filed many more applications, with much longer specifications,
and many more claims, than most other applicants. The number, volume, length, and complexity
of Mr. Hyatt’s applications are not ordinary.

Mr. Hyatt’s patent applications, including the four applications pending before the Court,
contain lengthy and detailed disclosures, including specifications. The 700-family specification,
which forms the basis of the °211 and ’398 applications, is comprised of 576 pages of text and 65
pages of figures. PTX-001.05255-5830; PTX-001.05840-905. The 500-family specification,
which forms the basis of the ’062 application, is comprised of 238 pages and 40 pages of figures.
PTX-002.01183-1458. The 600-family specification, which forms the basis of the °639
application, is comprised of 518 pages and 46 pages of figures. PTX-003.01333-1896. “Typical”
specifications are 20 or 30 pages. Trial Tr. 23:16 (Oct. 6, 2017 P.M. Session).

Mr. Hyatt’s applications, including the four applications pending before the Court, contain
unusually large sets of claims. Trial Tr. 79:10~11 (Oct. 10, 2017 P.M. Session) (“[I]t was
extremely unusual. I can recall one case that had approximately that number of claims.”). The
four applications before this Court presented a total of approximately 1,592 claims, including
claims that were subsequently canceled by Mr. Hyatt. Trial Tr. 50:6-20 (Oct. 12, 2017 P.M.
Session). Across Mr. Hyatt’s approximately 400 applications pending before the PTO in 2003,
those applications presented a total of approximately 115,000 claims, or on average approximately
300 claims per application. Trial Tr. 68:19~70:9 (Oct. 10, 2017 P.M. Session).

A PTO study of patent applications filed between 1995 and 2013 reveals that the “typical
application” contained 20 claims at the time it was filed. Trial Tr. 78:22—81:19 (Oct. 6, 2017 A.M.

Session); 74:2—8 (Oct. 10, 2017 P.M. Session); DX 251. A typical examiner on average is allotted

13
about 20 hours to examine 20 claims. Only 0.02% of all applications filed included more than 299
claims. See DX1486 4 162.

The largest technology companies filing GATT Bubble applications did not engage in the
same examinational behavior as Mr. Hyatt engaged in. See, e.g., Trial Tr. Day 4 P.M. Session,
29:17-31:15 (describing how 10 large companies filed pre-GATT applications with only 17.7
claims per application, as opposed to Mr. Hyatt’s average of 299 claims per application), 55:17-
25, Oct. 10, 2017.

The cases before the Court were filed in 2005 and 2009. In accord with a PTO stipulation,
see, e.g., 214-1 at *29, the years 2003-2012, a period in which PTO suspended examination of the
majority of Mr. Hyatt’s applications, is not considered in the present analysis. PTO restarted
examination of Mr. Hyatt’s remaining applications in 2013. PTO began issuing Requirements that

included prosecution laches warnings beginning in April 2015.!°

The Four Applications Before the Court

The ‘211 Application (Case no. 05-cv-2310)

Mr. Hyatt filed the ’211 application on June 1, 1995. PTX-004.07554. The °211
application is a continuation of patent application serial number 07/289,355, filed December 22,
1988, which is a continuation of patent application serial number 06/663,094, filed October 19,

1984, PTX-004.07555. The PTO entered a non-final Office Action rejecting the claims on

‘0 During oral arguments before the Federal Circuit in Hyatt v. Lee, 797 F.3d 1374 (Fed. Cir. 2015), Judge Moore
asked Government counsel, “How could there be 115,000 claims that were filed prior to June 8, 1995, that are still
kicking around? ....If Mr. Hyatt is responsible . . . why aren’t you nailing him to the wall with prosecution laches?
We handed it to you — why aren’t you using it?” See oral arg., dkt. 2014-1596, May 6, 2015 40:06 — 44:09.
Presumably, Judge Moore was referring to Bogese in 2002. PTO issued its first prosecution laches warning in one of
Mr. Hyatt’s applications nineteen days before that exchange. After oral arguments and up through its filing of its
Motion for Leave to file its Motion to Dismiss for Prosecution Laches in this Court on September 30, 2016, PTO
issued fifty-one additional warnings. See ECF 81-2 at *21-22.

14
September 22, 1995, and entered a final rejection made on July 31, 1996. PTX-087.00004. Mr.
Hyatt, using the transitional rules provided in 37 C.F.R. § 1.129(a) (“Rule 129(a)”), petitioned to
file an amendment, the effective equivalent of a continuing application, on March 25, 1997. PTX-
004.06587~-89. The PTO issued a non-final Office Action rejecting the claims on August 3, 1998.
PTX-087.00004. The PTO entered a final rejection of the claims on August 27, 1999. PTX-
087.00003; Trial Tr. 30:12-31:18 (Oct. 11, 2017 P.M. Session). Prosecution concluded in just
over four years, when the PTO issued a final rejection from which Mr. Hyatt appealed. PTX-087
(PALM record).

Having been twice rejected, the ‘211 claims were eligible for an appeal to the Board. E.g.,
Trial Tr. 6:16~-20 (Oct. 13, 2017 P.M. Session); 35 U.S.C. § 134(a). Mr. Hyatt timely noticed his
appeal to the Board on February 28, 2000, and he filed his appeal brief on August 28, 2000. PTX-
087.00003; Trial Tr. 30:12—31:18 (Oct. 11, 2017 P.M. Session). In the course of its decisions on
Mr. Hyatt’s appeal and subsequent motion for reconsideration, the Board reversed several
rejections by the examiner of the ‘211 application claims, ending the PTO’s administrative
adjudication of the ‘211 application on September 21, 2005. PTX-087.00006. Mr. Hyatt filed suit
under 35 U.S.C. § 145 to obtain a patent on claims in the ‘211 application on which the Board
affirmed at least one ground of rejection on November 18, 2005. At that time, jurisdiction passed

from the PTO to the United States District Court for the District of Columbia.

The ‘398 Application (Case no. 09-cv-1864)

Mr. Hyatt filed the °398 application on June 1, 1995. PTX-001.05921. The °398
application is a continuation of patent application serial number 07/289,355, filed December 22,
1988, which is a continuation of patent application serial number 06/663,094, filed October 19,

1984. PTX-001.05921; see PTX-004.07555. The PTO entered a non-final Office Action rejecting

15
the claims on September 19, 1995, and a final rejection on August 9, 1996. PTX-001.05184; PTX-
001.05137. Mr. Hyatt petitioned to enter a submission pursuant to 37 C.F.R. § 1.129(a) with an
amendment, effectively equivalent to a continuation application; the PTO subsequently rejected
the then-pending claims in a non-final Office Action on December 12, 2000. PTX-001.04812;
PTX-001.04505—06. Mr. Hyatt amended the claims on January 30, 2002. PTX-001.04268-69.
On July 31, 2002, January 23, 2003, and August 18, 2003, the PTO suspended prosecution in the
°398 application for a cumulative total of twenty months ending on February 18, 2004. PTX-
001.04255~57; PTX-001.04246-48; PTX-001.04211-13; Trial Tr. 31:20~33:13 (Oct. 11, 2017
P.M. Session). The PTO issued a non-final Office Action on September 7, 2004. PTX-001.04025-
26; Trial Tr. 33:6-34:7 (Oct. 11, 2017 P.M. Session).

Mr. Hyatt timely noticed his appeal to the Board on March’7, 2005. PTX-001.03898: He
filed his appeal brief on August 26, 2005, thereby closing prosecution. PTX-001.00928; Trial Tr.
34:14-25 (Oct. 11, 2017 P.M. Session). In the course of its decisions on Mr. Hyatt’s appeal and
subsequent two motions for reconsideration, the Board reversed numerous grounds of rejection
found by the examiner of the ’398 claims, concluding the PTO’s administrative adjudication of
the ‘398 application on July 8, 2009. PTX-086.00007. Mr. Hyatt filed suit under 35 U.S.C. § 145
to obtain a patent on claims on which the Board affirmed at least one ground of rejection on
September 25, 2009. At that time, jurisdiction passed from the PTO to the United States District

Court for the District of Columbia.

The ‘062 Application (Case no. 09-cv-1869)

Mr. Hyatt filed the ’062 application on June 6, 1995. PTX-002.1223. The °062 application

is a continuation of patent application serial number 06/661,649, filed October 17, 1984, through

16
several other continuation applications. PTX-002.1224. The PTO entered a non-final Office
Action rejecting the claims on September 18, 1995, and another non-final Office Action rejecting
the claims in full on June 26, 1996. PTX-088.00004. After Mr. Hyatt amended his claims, the
PTO entered a final rejection on October 16, 1997. PTX-088.00003. It therefore took the PTO
approximately two years and four months to issue the final rejection of Mr. Hyatt’s claims from
which he appealed. Trial Tr. 25:7—26:5 (Oct. 11, 2017 P.M. Session).

Mr. Hyatt timely noticed his appeal to the Board on or around March 4, 1998. PTX-
002.00891; PTX-088.00006. He filed his appeal brief on September 3, 1998. PTX-002.00557;
Trial Tr. 25:7~-26:22 (Oct. 11, 2017 P.M. Session). In the course of its decisions on Mr. Hyatt’s
appeal and three subsequent motions for reconsideration, the Board reversed numerous rejections
by the examiner of the ’062 claims, concluding the PTO’s administrative adjudication of the ‘062
application on July 8, 2009. PTX-088.0006. Mr. Hyatt filed suit under 35 U.S.C. § 145 to obtain
a patent on claims on which the Board affirmed at least one ground of rejection on September 25,
2009. At that time, jurisdiction passed from the PTO to the United States District Court for the

District of Columbia.

The ‘639 Application (Case no. 09-cv-1872)

Mr. Hyatt filed the ’639 application on May 1, 1995. The 639 application is a continuation
application of patent application serial number 07/279,592, filed December 2, 1988. PTX-
003.01380. The PTO entered a restriction requirement requiring Mr. Hyatt to elect one group of
claims for examination drawn to one invention on October 19, 1995. PTX-003.01311-13. On
July 24, 1996, the PTO rejected the claims in a non-final Office Action. PTX-085.00005. The
PTO rejected the claims in a final Office Action dated May 19, 1999, PTX-085.00005. It therefore

took the PTO just over four years from the filing of the ’639 application to issue the final rejection

17
from which Mr. Hyatt appealed to the Board. Mr. Hyatt timely noticed his appeal on October 19,
1999. PTX-085.0000S.

Mr. Hyatt filed his Appeal Brief on April 18, 2000, thereby closing prosecution. PTX-
085.00005; Trial Tr. 28:2-29:15.7. In the course of its decisions on Mr. Hyatt’s appeal and three
subsequent motions for reconsideration, the Board reversed numerous rejections by the examiner
of the °639 claims, concluding the PTO’s administrative adjudication of the ‘639 application on
July 8, 2009. PTX-085.00005. Mr. Hyatt filed suit under 35 U.S.C. § 145 to obtain a patent on
claims on which the Board affirmed at least one ground of rejection on September 25, 2009. At
that time, jurisdiction passed from the PTO to the United States District Court for the District of

Columbia.

PTO’s Examination Policy and Practice

PTO’s longstanding policy is to engage in “compact prosecution.” The goal of compact
prosecution is for the examiner to raise every noncumulative ground of rejection or objection that
the examiner finds to exist in one office action. See Trial Tr. 8:22-9:11; 84:17-85:7 (Oct. 6, 2017
P.M. Session). In general, the practice and policy of compact prosecution is prudent for PTO and
patent applicants alike, with the aim of resolving applications as quickly as possible. Trial Tr.
85:8-86:1.

Patent applicants have discretion as to how to prosecute their claims within the PTO’s rules
and regulations. The PTO has several legal authorities to regulate inequitable applicant conduct
during the examination process. These include undue multiplicity rejections, PTO’s Rule 11.18,
and 37 C.F.R. §1.145. PTO policy is that, absent entry of a restriction requirement, undue

multiplicity rejection, or prosecution laches rejection, applicants are entitled to an examination of

18
the claims presented in a single application, including claims directed to multiple inventions,
provided the applicant pays the required fees and complies with the patent statutes. Trial Tr. 15:13—
18 (Oct. 10, 2017 A.M. Session); 16:8-22 (Oct. 10, 2017 A.M. Session); 65:14—23 (Oct. 13, 2017
A.M. Session); see also Trial Tr. 78:24-79:3 (Oct. 10, 2017 P.M. Session) (“There is no limit to
what can be presented.”).

Applicants pay for every independent claim in excess of three and for every claim in excess
of 20 total claims in accordance with fee schedules set by the Government. Trial Tr. 16:23-17:11
(Oct. 10, 2017 A.M. Session). Mr. Hyatt has paid more than $7,000,000 in fees to the PTO in
recent years to have his applications and claims examined. PTX-099; Trial Tr. 17:2—19 (Oct. 10,
2017 AM Session); 65:9-12 (Oct. 11, 2017 P.M. Session). The PTO’s accounting is that Mr. Hyatt
paid only approximately $59 per claim, in light of the fact that an examiner on average was allotted
about 20 hours to examine 20 claims. See Trial Tr. Day 1 P.M. Session, 31:4-14, 4:9-16, Oct. 6,
2017; Trial Tr. Day 1 A.M. Session, 89:17-20, Oct. 6, 2017. In the past 5 years, the PTO has paid
over $10 million to examine Mr. Hyatt’s claims. See Trial Tr. Day 4 A.M. Session, 57:1-16, Oct.
12, 2017.

The time a patent application is pending in the PTO can vary based on factors intrinsic and
extrinsic to the application. Intrinsic factors might include: the number of claims presented for
examination, the claim amendment practice, claim “shifting,” entitlement to priority and benefit
sought by the applicant, written description support issues, double-patenting issues, and other
discrete issues raised by the patent office. See Trial Tr. 4:6-7:3 (Oct. 12, 2017 P.M. Session).
Extrinsic factors generally relate to PTO’s workload and allocation of resources, but also can
include an applicant’s willingness to cooperate with PTO examiners’ informal requests during the

examination process.

19
If an applicant wants to show entitlement to the night of priority to establish an earlier
effective filing date as against intervening prior art, it is the applicant’s burden to establish that
right of priority. See Trial Tr. 23:20—24:7 (Oct. 13, 2017 P.M. Session).

Under 35 U.S.C. § 112(1), the test for whether a specification contains an adequate written
description of the subject matter claimed in a patent application is whether it enables any person
with ordinary skill in the art to make and use the invention. Trial Tr. 22:9-14 (Oct. 10, 2017 P.M.
Session). That is a legal determination regularly made in patent application examination. Written
description rejections are “fairly common” in PTO practice, with numerous court decisions and
specific PTO guidelines addressing such issues. Trial Tr. 97:11—99:5 (Oct. 6, 2017 P.M. Session);
23:4-15 (Oct. 13, 2017 P.M. Session). The PTO can and does address claims that it contends lacks
written description support through written description rejections. Trial Tr. 97:11-99:10 (Oct. 6,
2017 P.M. Session); 23:4-24:12 (Oct. 13, 2017 P.M. Session). Should the examiner make a
written description rejection, the application must then demonstrate that there is adequate written
description support for the claims.

Double patenting is relevant to examination to avoid issuing a claim that is substantially
similar to another claim that is also under examination and may be subject to a rejection that would
be relevant to the other pending claim. The PTO attempts to police double-patenting issues during
examination, and issues provisional double-patenting rejections to which applicants respond, when
those issues arise in two (or more) pending applications. See, e.g., Trial Tr. Day 1 P.M. Session,
92:5-17, Oct. 6, 2017; Trial Tr. Day 3 A.M. Session, 40:18-41:4, Oct. 11, 2017; Trial Tr. Day 4
A.M. Session, 44:19-45-17, Oct. 12, 2017. Double patenting rejections “may be deferred until
allowable subject matter has been indicated. At that time, the allowed claims should be reviewed

against all related application claims for any double patenting issues.” PTX-003.00970.

20
Patent applicants are entitled to traverse rejections, including challenging those decisions
before the Board and/or in the courts. Patent applicants are entitled to amend or cancel claims to
avoid a ground of rejection.

After a patent application is filed, further mandatory action on the part of the applicant can

only be triggered by formal means in accord with PTO regulations.

Examination and Prosecution of Mr. Hyatt’s Applications

Despite being 3,000 pages long, the PTO’s Manual of Patent Examining Procedure does
not cover a case such as Mr. Hyatt’s. The PTO could not practice its typical and preferred mode
of compact prosecution of Mr. Hyatt’s claims across 400 lengthy applications. The PTO’s policy
of compact prosecution made it impossible to complete examination of Mr. Hyatt’s applications
in its desired manner under the time typically given to examiners. Mr. Hyatt’s applications could
not be treated as typical applications given their size and scope. See ECF No. 214-1 at *9 (“the
evidence showed that the applications could not be treated as typical applications given their size
and scope’) (citing Trial Tr. Day 2 A.M. Session, 75:14-77:15, Oct. 10, 2017); id. at *30 (“all
agree that Mr. Hyatt’s applications are far from typical”). The PTO has conceded that it could not
engage in compact prosecution with respect to Mr. Hyatt’s applications, given their unusual
characteristics. See ECF no. 214-1 at *8.

Mr. Hyatt attended a meeting in October 1995 with Nicholas Godici, a former PTO group
Director, during which they discussed focusing each of his applications on different subject matter.
Trial Tr. 54:10-65:3 (Oct. 10, 2017 P.M. Session). At the meeting, Mr. Hyatt agreed to “focus”
his claims by increasing the demarcation between applications. Trial Tr. 69:14~-70:9 (Oct. 10,
2017 P.M. Session). Neither Mr. Godici nor Mr. Hyatt memorialized the purported agreement in

an interview summary, even though doing so is required by PTO rules. Trial Tr. 53:17-20 (Oct.

21
11, 2017 P.M. Session); 14:4-15:1 (Oct. 6, 2017 P.M. Session); 12:25—13:20 (Oct. 10, 2017 A.M.
Session). Despite those formal rules, conversations between applicants and examiners, never mind
Group Directors like Mr. Godici, are not always memorialized in interview summaries. Trial Tr.
Day 2 A.M. Session, 62:10-16, Oct. 10, 2017.

After his conversation with Mr. Godici, Mr. Hyatt proceeded to file petitions to enter
amendments in some of his applications. Trial Tr. 53:1-13 (Oct. 11, 2017 P.M. Session). A
number of those petitions were denied by Mr. Godici. Trial Tr. 54:3-56:12 (Oct. 11, 2017 P.M.
Session); PTX-051; PTX-052. After the October 1995 meeting, the PTO continued examining
Mr. Hyatt’s applications, rather than make rejections on procedural grounds.

Mr. Hyatt never “focused” his claims in accordance with the informal agreement made
during the October 1995 meeting. In 2015, Mr. Hyatt stated he never had a “master plan” to do
so. See ECF 81-2 at *23; Trial Tr. 73:7-76:5 (Oct. 11, 2017 A.M. Session).

Mr. Hyatt has made numerous amendments to the claims in his applications, including the
four applications pending before this Court. See Trial Tr. 68:19-70:9 (Oct. 10, 2017 P.M. Session)
(contending Mr. Hyatt submitted 115,000 claims for examination via his amendments); 51:3-
56:15 (Oct. 10, 2017 P.M. Session) (testifying regarding amendments in the four applications
before the Court); see also PTX-001.05167; PTX-001.04951; PTX-001.04812; PTX-001.04268;
PTX-002.01180; PTX-002.01102; PTX-002.01111; PTX-003.01314; PTX-003.01257; PTX-
003.00990; PTX-004.06831; PTX-004.06716; PTX-004.06607; PTX-004.06309; PTX-
004.05962; Trial Tr. 50:6-20 (Oct. 12, 2017 P.M. Session) (stating Mr. Hyatt submitted 1,592
claims for examination via amendments). Mr. Hyatt’s amendments, in some instances,
substantially rewrite claim language and add additional claims. E.g., Trial Tr. 75:13-78:14 (Oct.

10, 2010 P.M. Session) (Morse testimony discussing amendment in the ’211 application).

22
From approximately 1995 through 2003, the PTO issued numerous non-final and final
Office Actions on the merits of Mr. Hyatt’s patent applications. The PTO issued 13 of Mr. Hyatt’s
patent applications (between June 1995 and May 1997), and withdrew from issuance 4
applications. For approximately 100 of Mr. Hyatt’s applications, the PTO issued rejections that
Mr. Hyatt appealed (closing prosecution) and briefed before the Board. See PTX-005; PTX-
019.00008—-9; DX-254; DX-268.

Between approximately 2003 and 2012, 80 of Mr. Hyatt’s pending applications were held
by PTO in a proverbial Never-Never Land, with no Examiners’ Answers filed that, under PTO
regulations, were required to trigger Board consideration of Mr. Hyatt’s appeals in those
applications. PTO has stipulated that this period is not time that can be attributed to Mr. Hyatt’s
’ allegedly unreasonable and unexplained delay. See, e.g., ECF No. 214-1 at *29.

The PTO did not issue any prosecution laches warnings as to any of Mr. Hyatt’s pending
applications prior to the commencement of litigation in these cases, although it had authority to do
so if it had deemed his conduct so inequitable as to merit it.

The PTO did not reject any of Mr. Hyatt’s pending claims under the doctrine of prosecution
laches prior to the commencement of litigation in these cases, although it had authority to do so if
it had deemed his conduct so inequitable as to merit it.

There is no record of the PTO invoking Rule 11.18 in these applications, nor did the PTO
apply undue multiplicity rejections or deny entry of amendments in Mr. Hyatt’s applications prior
to 2013. More recently, the PTO has issued formal Requirements, laches warnings, and laches
rejections as to several of Mr. Hyatt’s applications not among the four directly at issue in this

litigation.

23